TROTTER vs. THE BOARD OF PRESIDENT AND DIRECTORS OF ST. LOUIS PUBLIC SCHOOLS.

1. The first section of the act of Congress, of 13th June, 1812, disposes of all lots, which had been inhabited, cultivated, or possessed prior to Dec'r., 1803; and was intended only to settle claims, rights, or titles originating under the Spanish government.

2. The second section was intended to make a donation, and is not confined to the lots mentioned in the first section but reserves for schools, all the land embraced in the out-boundary directed to be run in the first section, and not rightfully owned or claimed by private individuals, or held as commons belonging to some town or village, or reserved for military purposes.

3. Under the second section, neither occupancy nor possession prior to Dec'r., 1803, is necessary to establish a town lot, or out-lot of a town.

4. A survey made by an officer authorized by law, is prima facia evidence, and cannot be questioned by a mere trespasser.

ERROR to St. Louis Court of Common Pleas.

J. SPALDING, for Plaintiff in error.

POINTS AND AUTHORITIES.

1. The right of the plaintiff below is limited and governed entirely by the words of the second section of the act of Congress, of 13th June, 1812, and is confined to "all towns or village lots, out-lots, or common field lots," included within an out-boundary line directed by that act, and not rightfully owned or claimed by any private individuals. 2 Story's Laws 1257, act of June, 1812; 3 Story's Laws 1972, act of

Trotter vs. the Board of President and Directors of St. Louis Public Sch ols.

May 26, 1824; 4 Story's Laws 220, act of January 27, 1831 ; act of General Assembly of Missouri, February 13, 1833, p. 37, incorporating board of trustees.

2. The lands reserved for the use of schools in the 2d section of the act of Congress of 13th June, 1812, is confined to what was either *a town or village lo'*, *out-lot*, or *common field l.t*, *before or at* the transfer of the country to the United States.

*First*, The words in the first section undoubtedly apply only to lots, as such, under the former government, and the words in the second section reserving for schools, are identically the same.    6 Mo. Rep. 292-3-4 and 297, Hammond vs. Board of Public Schools, 8 Mo. Rep.

*Second*, The scope and purview of all the acts of Congress relating to the  lands and  claims and donations, or confirmations of the same in Missouri, show  that only  those claims are meant which originated under a former government, French or Spanish ; and if this reservation applies to others, it is a solitary instance in  that branch  of Congressional legislation.

*Third*, The phraseology of the act of 26th May, 1824, indicates that the lots reserved had a previous existence as "lots," and were not mere vacant ground, or space ; see the words "so many  of said vacant town lots," &c.

*Fourth*, An examination of the words in the 1st and 2d sections of act 13th June, 1812, shows that both the  confirmation and reservation of lots applies only to *Spanish lots*.    There could be no *town lots*, no *common field-lots*, but by Spanish authority.    In the 2d section the words are in the alternative.    12 Peter's Rep. 350, Strother vs. Lucas.

*Fifth*, The words "out-lot" in the act of 13th June, 1812, as applied to St. Louis, adds nothing to the meaning of the act, as there were no "*out-lots*" other than the common fields; but as applied to  several of the other villages  enumerated  in the act,  it was necessary, because there were  "*out-lots*," not common field-lots, at those villages.    See record p. 41, Milburn's evidence ; do. p. 43, Conway's evidence ; do. p. 51, Brown's testimony.    See the plats  of Ste. Genevieve, and New Bourbon in the record, which  are rural villages, and made up of large and frequently irregular lots, many of them called "*out-lots*."

*Sixth*, The situation of the villages of St. Charles and Carondelet, requiring the extension of village lots as the towns increased, to be made on the *commons*, accounts for the phraseology of the  second section, or "held as commons belonging," &c.

*Seventh*, The letters of Penrose and Riddick, see 2d vol. Land Documents p. **376**, show that "*out lots*" and "*common field lots*" are syn-

onymous, and that *vacant pieces* of ground not designated as lots, were not intended by said act of Congress.

*Eighth,* The report of the old Board of Commissioners, 2 vol. Land Documents, p. 388 to 683. Report of Recorder acting in lieu of the board, vol. 3 Land Documents p. 274. It appears that the old board never call *common field lots, out lots,* but that the Recorder applies the two words to be the common field lots of St. Louis indiscriminately: but he did not apply the word *"out lot"* to any other piece of ground than common field lots at St. Louis.

3. If the reservation in the 2d section of the act of June 13th, 1812, embraces town or village lots, *out lots,* and common field lots, as they were at the date of that act, it is yet to be confirmed to the towns or villages properly so called, and does not refer to the limits of them as incorporated under the American government, and therefore does not include the ground in question.

*First,* Because the local legislature could include as much territory as it pleased in the town, and as the incorporation was the act of a court, Congress could not know the size, and would not have made a reservation thus in the dark.

*Second,* St. Louis as then incorporated, contained many square miles, lying in the neighborhood of the town proper, as the decree of the court and the survey show.

*Third,* In 1812, the town proper did not extend as far as the ground in question. See testimony of Moore, p. 37, of record, and of Rene Paul, p. 29.

4. The out-boundary line as required by the first section of the act of 13th June, 1812, would not embrace the ground in question. See the plats and the testimony of Milburn, &c.

*First,* The words of the act 1st section, requires the out-boundary lines to be run so as to embrace the villages and the *out lots, common field lots, and commons, thereto respectively belonging.* Such *lots* therefore to be embraced must *belong* to the village; a vacant unappropriated space of ground, *does not* and *did not* belong to the village of St. Louis ; and the lot in question *did not* belong to it.

*Second,* But the *"common field lots"* did belong to their respective villages and so did *the commons* and *"out-lots,"* in the instances where such commons and out lots existed. 12 Wheaton's Rep. 441, White's Compilation. These provisions for making new settlements were not observed here it seems ; but the very minute enactments show that the Government only could make towns or lots, &c., and also when a town was made, it comprehended lands other than the village lots, &c.

5. The act of incorporation of plaintiff divests the trust fund, and is therefore unconstitutional and void. Acts of session of November 1832, p. 37.

*First*, All free white persons as the city was then, or should be, are members of the corporation.

*Second*, The directors are to be chosen by all free white males residing in the city, as the same may be extended from time to time.

6. The jury were not *legal and impartial..* 3 Bacon's Abr. 756. Partiality of jurors, good cause of challenge. "If an action be brought by corporation," &c., 2 John. Rep. 194, Wood vs. Stoddard; it shows that inhabitants of a town were not proper jurors, in a suit the avails of which in part went to the support of the poor. 19 John. Rep. 121. This case shows how careful courts are, even at this day, that jurors shall be *omni exceptione major.* 2 Caines Rep. 133; at the close of the opinion, the court say "underwriters can hardly be proper jurors in cases in which persons pursuing the same business are parties. Jurors should be *omni exceptione major.* 7 Cranch 290, McQueen and Child vs. Heburn, showing at page 297, that jurors must be *omni exceptione majores.* 3 Black. Com. 363, as to Challenges, "*propter affectum,*" &c.

Henry S. Geyer, for defendant in error.

The decisions of the court of common pleas are maintained to be correct upon the state of facts presented by the record on the following grounds :

1. The reservation and subsequent relinquishment of lots were made for the benefit of the inhabitants then and future, of the town as it was in 1812, or as it was directed to be surveyed by the act of 13th June, 1812, and in either case the modern city is included ; and whether the town contemplated by Congress was of greater or less extent, the power vested in the Legislature of the State to provide for the disposition of the lots reserved and relinquished by the act of Jan. 1831, committed to the Legislature the choice of trustees or agents, which power was rightfully exercised in the act incorporating the plaintiffs ; consequently there is no valid objection to the right of the plaintiffs to recover any lot, duly set apart for the use of schools, within the out-boundaries of the survey directed by Congress, 2 Story 1257; 3d do. 1973; 4 do. 2220; acts 1832, p. 7.)

2. Whether the land in controversy is or is not whithin the reservation and relinquishment for the use of schools—it is not land, the sale

of which ever was authorized by law, and therefore not subject to entry under a New Madrid certificate: the defendant is, consequently a mere trespasser claiming by possession only, and is not in a condition to controvert the propriety of the survey as made and returned, or any other official act of the officers of the United States, within the scope of their authority. See acts of Congress above cited, and act of Congress of 3d March, 1811, 2 Story 200, 17 Feb'y. 1815; 2 Story 1500; Geyer's Digest 484; Hunter vs. Hemphill, 5 Mo. Rep. 119.

3. Whether the defendant is or is not allowed to dispute the effect of the documents given in evidence—they were duly authenticated by the officers having custody of the originals, and the originals are the acts of officers entrusted by law with the authority to make them. They were pertinent to the matter in controversy, and were therefore competent evidence both by statute and upon general principles. If there was any thing in 'either of them irrelevant to the issue that ought to have been pointed out and distinctly objected to, but as the official acts of officers, performed within the scope of their authority, they were at least *prima facie* evidence. (Acts of Congress, 2 Story 1257; 3 do. 1973; 4 do. 2200; Rev. C. Mo. 251; 1 Starkie 156, 161; United States vs. Perchman, 7 Peters 53.)

4. It was the province of the court and not of the jury, to decide what the act of Congress required to be included, or excluded from the general survey of the town. If the question was at all open to enquiry whether the act of the officer to whom the duty was intrusted, had judged rightly in a matter confided exclusively to him, his judgment when not questioned by the United States, is not to be overruled by the opinion of a jury, and still less by the opinion of witness, who had not access to the information necessary to determine the question. It is not sufficient to invalidate the survey, that it might have been so run as to exclude the land in dispute, or include a greater extent of territory: either case involves the interpretation of an act of Congress which could not be refered to a jury. *Prima facie*, the survey includes all that it ought, and no more. This fact instead of being rendered doubtful by the evidence, is established by it, and therefore it was correctly held to be *prima facie* correct, and not invalidated by any evidence given. (See acts of Congress above referred to, and the survey, certificate and instructions in evidence. Hammon v. President, &c., St. Louis Public Schools; Janis v Gurno, 4 Mo. Rep. 458; Gurno vs. Janis, 6 do. 352; 8 do. 432-3-4-5 and 464; 9 do. 134, 734-5, and 12 do. 437-8, Hunter vs. Hemphill; U. S. vs. Perchman, and acts of Congress above cited, 6 Peters' 728.

5. What constitutes a lot, within the meaning of the act of Congress, is a question of law, depending upon facts, as locality, boundaries, &c. and therefore the court could not be required to refer the whole question to the jury as was attempted in the first ten instructions.　To constitute a lot within the reservation, it is not necessary that it should have been within the limits of the town during the Spanish or French governments, as assumed in the 4th instruction; it is sufficient that it is within the general survey of the town as directed by act of Congress; or that it should have been made a town, or village lot, out-lot or common field lot, previous to the 13ih of June, 1802, by *proper authority*, as asserted in the 5th instruction; nor could the jury be authorized to decide the question of *authority*; nor did the acts of Congress declare that the land reserved, should be a common field lot, or embraced within the streets, or among the regular lots of the town, as assumed in the 8th and 10th instructions.　The term " lot," has no technical meaning, but is used in the acts of Congress, in its common or popular sense, signifying a parcel of land, with defined limits, no matter what the form, or whether the boundaries have been designated for the particular land, or the surrounding lots, by grant or occupation; nor is it necessary that it should be in the common field.　If the parcel of land so designated by metes and bounds, is embraced by the streets, or is among the regular village lots, it is a village lot, if not, it is an out-lot, though not a common field lot; and if vacant, and unappropriated on the 13th June, 1812, and not confirmed by the act of that date' it is reserved for school and military purposes by the 2d section, unless held as commons; and this without regard to whether it had ever been granted, or set apart as a lot, to any person or persons.　(Acts of Congress, 2 Story 1257; 3 do. 1973; 4 do. 2220; 1 Dougl. R. 30; 1 T. R. 53; 2 do. 387, 586; 4 M. & S. 210; 6 Bac. Abr. Statute I., 2, 7; Willis 397; 4 do. 30; Vasseur v. Benton, 1 Mo. Rep. 296; Salle alias Lajoy vs. Primm' 3 do. 534; 12 Peter's 453; Gurno vs. Janis, 6 Mo. Rep. 530; Lawless v. Newman, 5 Mo. Rep. 240.

NAPTON, J. delivered the opinion of the court.

This was an action of ejectment to recover a lot in the city of St. Louis, bounded east by Second street, south by Cherry street, west by Third street, and north by a lot or small tract of five or six acres, granted to J. Clamorgan, and surveyed in 1803.

The plaintiffs below recovered a judgment for a portion of said lot.

The title of the plaintiffs was derived from the act of Congress of

June 13, 1812, making further provision for settling the claims to land in the territory of Missouri.

It appeared that in accordance with the act of the Territorial Legislature of 18th June, 1808, authorizing the incorporations of towns in certain cases the court of common pleas in the district of St. Louis, made an order dated 6th November, 1809, incorporating the town of St. Louis, and the lot sued for is within the corparate limits so defined. It was also embraced within the out boundary, made in pursuance of the act of 13th June, 1812, and the act of 26th May, 1824, purporting to be the out boundary line of St. Louis, so as to embrace the cut-lots, common field lots in the common field of St. Louis, and the commons thereto belonging.  In pursuance of instructions from the Commissioner of the General Land Office, dated 15th Jan'y, 1839, directing the surveyor to designate and set apart for the support of schools in the town of St. Louis, the vacant land lying between the survey of Clamorgan and Cherry street, the lot in dispute was so designated and set apart as directed.  It appeared that the lots so designated and set apart had not been reserved for military purposes, and that they did not exceed one-twentieth part of the whole lands included in said survey.

The defendant offered as an outstanding title, a New Madrid location, made by the legal representatives of Henry Peyroux, which embraced the lot in controversy, as well as several lots south of Cherry street, and Spanish claims north of the town.

The defendant also, with a view to show that the lot in controversy was not within the limits of the Spanish town as it existed in 1803, offered various documents in evidence: 1. Clamorgan's claim and concession, and the survey of it by Soulard in 1803.  This survey describes the claim as lying four arpens north of St. Louis, and bounded on the south by vacant lands adjoining the town.  2. An ancient plat derived from the former government, containing surveys of sundry grants lying north of Clamorgan, in which are laid down the position of the *half moon* and the *bastion*, and the lots south of Cherry street are described as the *first lots of the town*.  3, 4, 5, & 6.  A plat of the town made by Auguste Chouteau in 1780 ; the petition of Pierre Chouteau and others, for the confirmation of the whole town in 1808, and of the proceedings of the Board thereon, recognizing said plat.  7. The concession to Chouteau in 1799, of 133 arpents, lying within the out-boundary line, as offered in evidence by plaintiff, and a plat of Chouteau's mill tract, containing 1300 arpents, and other tracts lying all within said out-boundary line.

The testimony of several surveyors and others, familiar with the old

town or village of St. Louis, was introduced by the defendant, with a view to show the size and situation of St. Louis, at the time of the change of government.

The strip of land on which is situated the lot now claimed, lay between Clamorgan's grant and the first tier of lots as laid down in the ancient map of the town. In 1799, one Beauvois petitioned the Lieut. Governor for a part of this strip, describing the portion he desired as "situate to the north of the town, on the hill west of Main street, and bounded south by a cross street that separates it from the last lot of the town ; on the north by the land granted to Clamorgan, &c., which space may contain about the ordinary lot of 120 feet front, by the ac. customed depth of 300 feet," &c. The concession was made in November, 1803. East of Main street another portion of the strip was granted to Madame La Chaise. This location of Madame La Chaise was not surveyed, the surveyor stating that he did not know whether a street ought to be traced out in that portion of the town, and if so, on whose land the street ought to be traced, and therefore he had put the widow La Chaise in possession of the land lying between Clamorgan and Lacompte. The location is described in the Recorder's report as a lot in the town of St. Louis, and was confirmed as such, possession having been proven prior to 1803.

These same witnesses gave their opinion also, that the term "outlot," used in the act of Congress 13th June, 1812, so far as it applies to St. Louis, means nothing other than common field lots ; that the term is not found among the land records in St. Louis.

Some testimony was given in relation to the out boundary line as given in evidence ; some of the witnesses being of the opinion that it did not embrace enough, as it left out the Barriere des Noyes and Grand Prairie common fields, which they supposed to be common fields belonging or appendant to St. Louis ; others declaring that this out-boundary line might have been so run as to have embraced everything enumerated in the act of Congress, and have still left out the lot sued for.

These witnesses were or had been public surveyors.

The plaintiffs asked and the court gave two instructions to the jury, to wit :

" 1. The official survey given in evidence by the plaintiff, purporting to be a survey made in pursuance of the act of Congress of 13th June 1812, is *prima facie* evidence of the out-boundaries of the town of St. Louis, surveyed so as to include the out lots, common field lots and commons thereto belonging.

2. If the jury find from the evidence that the lot or parcel of land, designated by the survey numbered 3198, given in evidence in this case, is within the out-boundaries of the town of St. Louis, surveyed so as to include the out-lots, common field lots, and commons thereto belonging, and that before the commencement of this suit, the Surveyor of Public Lands, for the States of Illinois and Missouri, under the instructions of the Commissioner of the General Land Office, did survey, designate, and set apart to the said town, the said lot for the support of schools therein, then the plaintiffs have shown a sufficient title to said lot."

The defendant asked the following instructions, which were refused:

"1. If the jury believe from the evidence, that the land sued for in this action was not, nor any part thereof, a town lot, village lot, or common field lot, at the time the American Government took possession of the Upper Louisiana, they are bound to find for the defendant.

2. If the jury believe from the evidence that the land sued for in this action was not, nor any part thereof, either a town lot, village lot, out-lot, or common field lot, on the 20th Dec. 1803, they are bound to find for the defendant.

3. If the jury believe from the evidence, that the land in question in this suit, was beyond the limits of the town of St. Louis, as' the same existed under the French and Spanish Governments, and that on the 13th June, 1812, it was not in whole nor in part a portion of the land inhabited, used or laid out for the purposes of said town, or its inhabitants, they are bound to find for the defendant.

4. If the jury believe from the evidence, that the land in question was, during the French and Spanish Governments, outside of the town of St. Louis, and was, down to the 13th June, 1812, an unappropriated and vacant space, beyond the regular limits of said town, they are bound to find for the defendant.

5. The act of Congress of the 13th June, 1812, entitled "an act making further provision for settling the claims to land in the territory of Missouri," does not reserve for the use of schools, in the towns and villages therein mentioned, any land which had not been made a town or village lot, out-lot, or common field lot, previously, *by the proper authority.*

6. If the jury believe from the evidence, that the survey of the out-boundary line of the town of St. Louis, under the first section of an act of June 13th, 1812, could have been so run as to include the out-lots, common field lots, and commons thereto belonging, and exclude

the land in dispute in this action, they are bound to find for the defendant.

7. That the location under the New Madrid certificate, so called, in favor of Henry Peyroux, given in evidence in this case, is a better title to the land in question than that shown by the plaintiff, if the jury believe from the evidence that the said land is embraced in such location, and that it was not on the 13th June, 1812, or before, either a town or village lot, out-lot, or common field lot of St. Louis.

8. If the jury believe from the evidence that the land in question before, and on the 13th June, 1812, was a vacant space not embraced within the streets of St. Louis, nor included among the regular lots of the village, and that it had never been a common field lot, then the said act of Congress did not reserve it for the support of schools.

9. If the jury believe from the evidence, that the out-boundary line of the survey of St. Louis, under the act of Congress of the 13th June, 1812, given in evidence by the plaintiff, does not include all the common field lots belonging to St. Louis, then the same line has been illegally run, and is not evidence of title.

10. That the land in question was not reserved for the use of schools by the act of Congress of 13th June, 1812, although a vacant space lying within the limits of St. Louis, as incorporated by the court of common pleas, unless it were a town or village lot, out-lot, or common field lot, previously designated as such.

11. A mere vacant, unappropriated space of ground, outside of the village of St. Louis, as such village was on the 13th June, 1812, is not, of course, an out-lot within the meaning of that act, although lying within the limits of the town of St. Louis, as incorporated by the court of common pleas, by the order given in evidence, and although not a common field lot.

12. The boundary line of St. Louis, of the lots and commons thereof, given in evidence by the plaintiff, has not been run according to law, and therefore no evidence of title.

13. That the town or village lots, out-lots, or common field lots, reserved for the use of schools, by the act of 13th June 1812, and relinquished by the act of 29th January, 1831, to the inhabitants of the several villages therein mentioned, was a reservation to the use of the villages, as they stood under the French and Spanish Governments, and the act of the Legislature incorporating the plaintiffs, to be elected by the inhabitants of the city of St. Louis, as it stood incorporated at the passage of said act, is ineffectual to divest the trust fund from the ancient inhabitants of the village of St. Louis, to the modern city of St

Louis; and the authority in the act authorizing the election of the board of dirictors, by others than the grantees, is null and void, and the plaintiffs have no legal existence, and cannot maintain this action.

14. The reservation by the acts of 1812 and 1831 aforesaid, to the use of the inhabitants of the villages named in the said act, was a reservation to the use of the inhabitants of the villages as they stood in 1812; and the act of the Legislature of Missouri, incorporating the plaintiffs as trustees for the use of the inhabitants of the modern city of St. Louis, is ineffectual to divert the trust to the use of such inhabitants, and the authority in said act to elect the board of directors of public schools, &c., for the modern city of St. Louis, is null and void, as diverting the objects of the grant, and the plaintiffs have no legal existence, and cannot maintain this action.

15. That the plaintiffs are not entitled to recover in this action, because the acts of Congress of 13th June, 1812, and January 1831, and the act of the Legislature of Missouri, incorporating the plaintiffs, have conferred no title on them, and they are not entitled to recover.

16. If the jury find from the evidence that the instructions from the General Land Office, under date of 15th January, 1839, accompanied with a diagram, B, referred to in said instructions, and designated on said diagram by the colors green and yellow, to survey and set apart the school lands, does not embrace the land in question, they must find for the defendant."

The merits of this case depend upon the construction of the first and second sections of the act of 13th June, 1812, which are as follows:

§ 1. *Be it enacted, &c.,* That the rights, titles, and claims to town or village lots, out-lots, common field lots, and commons in, adjoining and belonging to, the several towns or villages of Portage des Sioux, St. Charles, St. Louis, St. Ferdinand, Villa a Robert, Carondelet, Ste. Genevieve, New Madrid, New Bourbon, Little Prairie and Arkansas, in the Territory of Missouri, which lots have been inhabited, cultivated or possessed prior to the twentieth day of December, one thousand eight hundred and three, shall be, and the same are hereby, confirmed, to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto: *Provided*, That nothing herein contained shall be construed to affect the rights of any persons claiming the same lands, or any part thereof, whose claims have been confirmed by the board of commissioners for adjusting and settling claims to land in the said territory. And it shall be the duty of the principal deputy surveyor for the said territory, as soon as

may be, to survey, or cause to be surveyed and marked, (where the same has not already been done according to law,) the out-boundary lines of the said several towns or villages, so as to include the out-lots, common field lots, and commons thereto respectively belonging. And he shall make out plats af the surveys, which he shall transmit to the surveyor general, who shall forward copies of the said plats to the Commissioncı of the General Land Office, and to the Recorder of Land Titles: the expense of surveying the said out-boundary lines shall be paid by the United States, out of any moneys appropriated for surveying the public lands: *Provided*, That the whole expense shall not exceed three dollars for every mile that shall be actually surveyed and marked.

§ 2. That all town or village lots, out-lots, or common field lots, included in such surveys, which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, shall be, and the same are hereby reserved for the support of schools in the respective towns or villages aforesaid : *Provided*, That the whole quantity of land contained in the lots reserved for the support of schools in any one town or village, shall not exceed one-twentieth part of the whole lands included in the general survey of such town or village.

For the purpose of enabling the Surveyor General to distinguish the lots claimed by individuals from those reserved under the 2d section above recited, the act of 26th of May, 1824, was passed. It enacts :

"§ 1. That it shall be the duty of the individual owners or claimants of town or village lots, out-lots and common field lots, in, adjoining or belonging to the several towns or villages of Portage des Sioux, St. Charles, St. Louis, St. Ferdinand, Villa a Robert, Carondelet, Ste. Genevieve, New Madrid, New Bourbon, Little Prairie and Arkansas, whose lots were confirmed by the act of Congress (13th June, 1812,) on the ground of inhabitation, cultivation or possession, prior to the 20th Dec. 1803, to proceed within eighteen months after the passage of this act, to designate their said lots by proving before the Recorder of Land Titles, the fact of such inhabitation, cultivation or possession, and the boundaries and extent of such claim, so as to enable the Surveyor General to distinguish the private from the vacant lots appertaining to the said towns and villages."

"§ 2. That immediately after the expiration of said term allowed for proving such facts, (26th Nov. 1825,) it shall be the duty of the Surveyor General, within whose district such lots lie, to proceed under

the instructions of the commissioner of the General Land Office, to survey, designate and set apart the said towns and villages respectively, so many of the said town or village lots, out lots and common-field lots, for the support of schools, in the said towns and villages respectively, as the President of the United States shall not before that time (26th November, 1825,) have reserved for military purposes not exceding one-twentieth part of the whole lands included in the general survey of such town or village, according to the provisions of the second section of the above mentioned act of Congress."

This section also directs a survey of the commons, and provides, "that lots relinquished to the United States on account of damage done them by earthquakes, and in lieu of which, lands have been located elsewhere, shall neither be so designated, nor set apart, nor taken into the estimate of the quantity to which any town or village is entiled."

§ 3. This section requires the Recorder to issue a certificate of confirmation, and "that as soon as the said time shall have expired, he shall furnish the Surveyor General with a list of the lots so proved to have been inhabited, cultivated or possessed, to serve as his guide in distinguishing them from the vacant lots to be set apart as above described, and shall transmit a copy of said list to the commissioner of the General Land Office.

By the second section of the act of 27th January, 1831, the United States relinquished all their rights, title, &c., to the town and village lots, out-lots, and common field lots, in the State of Missouri, reserved for the support of schools in the respective towns and villages, by the second section of the act of 13th June, 1812.

The question is, what lands are reserved by the 2nd section of the act of 13th June, 1812? On the one side, it is contended that all the lands included within the general survey directed by the first section, which are not disposed of to private claimants, by said section, are reserved by the second, partly for military purposes, partly for schools as the subsequent legislation of Congress, or the action of the executive, might determine. On the other hand, the plaintiff in error insists, on a more rigid construction of the language of the act; he maintains that the same language being employed to designate the subject matter of legislation in both sections, the same construction must be given to the terms employed in one section that is given to the same terms in the other. Hence, it is insisted, that as the first section confirms to individuals village lots, out-lots, common field lots, only as they existed in 1803, the second section must be limited to the same subject matter,

to wit: to *lots which had existence under the former government.* This construction, it is said, is not only warranted by the letter of the law, but is consistent with the general scope of Congressional legislation on this subject: the object of all the laws in relation to the settlement of land claims in Missouri, being uniformly confined to such as originated under the former government. This section, therefore, if it applies to anything that was not a lot, made so by grant, or user under the former government, must be a solitary exception to the general course of legislation. The apparently careful use of the word "lots," in both the first and second sections, and the repetition of the same terms in the supplementary acts of 1824 and 1831 is invoked as a circumstance confirmatory of this interpretation. Hence, the second section speaks of the "quantity of land *contained in the lots* reserved for the use of schools," &c.; and the act of 1824 directs the Surveyor General to set apart *"so many of the said vacant town or village lots,* out lots and common field lots," as the President shall not have reserved, for military purposes.

I cannot concur in this rigid interpretation of this act, but am led to a different conclusion, from a view of what seems to be the general scope and design of the law, as well as from the distinct and separate objects proposed by the two sections under consideration; and this conclusion, as I conceive, is not only warranted by its language, but is better supported by the history of its origin and purposes, as disclosed in the State papers, portions of which were read at the trial.

Congress designed to dispose of the whole subject matter about which they were legislating. When, therefore, they directed an out boundary line to be run, they obviously intended that survey to embrace all the particulars previously enumerated in the section, and it was as clearly designed that these particulars, to wit: the village lots, out-lots, common field lots, and commons, should comprehend every-thing within that line. Of what avail was this out-boundary line, unless everything within it was disposed of?

It will be observed that the first section had disposed of all the lots that had been "inhabited, cultivated, or possessed, prior to 1803;" that is, the whole of the Spanish village, or town proper. Then an out-boundary line was directed, and the second section disposes of all the lots, out lots, &c., within this out boundary, but without limiting them to such as had been "occupied," &c., under the former government. Now, if it was the intention of Congress only to reserve the lots, out-lots, &c., which were enumerated in the first section, and acquired their character as such from occupancy or survey under the Spanish

6

government, why direct that an out-boundry line shall be run? An enumeration of the particular classes of land, as it was made in the first section, would have answered every purpose, and no " useless investigation," as Mr. Riddick terms it, is saved by directing this line. The same questions arise under the second section, which did under the first; the same proof is necessary, and so far as the General Government, and the schools were concerned, they could get nothing by proof, except where such lots had been abandoned by their proprietors.

It is true that the second section embraces nothing which is not conveyed by the same terms in the first, except that the inhabitation, possession or cultivation required by the first section, is not required by the second; but these terms, if taken in their ordinary acceptation, are large enough to embrace every thing within the out-boundary line directed to be run. Hence, the word *out-lot* is interpreted as synonymous with common field lot, by those who would limit the operation of the second section to such lots as were recognized by the Spanish authorities. But the limitation of these words in the first section, is not to be found in the second.

But the motive and design of these two sections of the act of 1812, are totally different. The first section in conformity with the title of the act, was designed for the settlement of claims, rights and titles, originating under the former government; it was the fulfilment of an obligation imposed upon this Government, by their treaty with France; and its operation is confined to this object solely. The second section obviously grows out of different motives, and has in view different purposes. It was a mere gratuity so far as the donation for schools is concerned, and the reservation, in other respects, appears designed for the convenience of the Government. There is no reason why Congress, in making the reservation in the second section, should have been limited to Spanish claims or to lots which were recognized by the former government, as appurtenant to the village.

Whilst this intent of the law makers is to be inferred from the law itself, the letters of Mr. Riddick and Penrose, contained in the State Papers of that year, (Duff Green's ED. v. II. p. 377,) are calculated to strenghten this construction of the act.

In Mr. Penrose's letter to Mr. Gallatin he says " claims for field or out-lots, as they are termed, should be confirmed, recorded or not recorded. All these tracts have been cultivated and possessed from 15 to 50 years. All this class are, the Grand and Little Prairie and Barriere des Noyes St. Louis· There may be a few vacancies perhaps in these fields, grant them in such case to the inhabitants for

public schools." Again he says : " It would probably be best to con-
firm the town, generally to the inhabitants, and if there be any vacant
lots, grant them for public schools." Mr. Penrose evidently considers
out-lots, and common field lots as synonymous.

Mr. Riddick's letter was addressed to the chairman of the committee
on public lands, and is dated March 26th, 1812, "Class 49th," he says :
"Villages, commons, common field, and lands adjacent, given to the in-
habitants individually for cultivation, possessed prior to 20th December,
1803." On this class he remarks : "The 49th Class will comprise near-
ly one-fourth in number of all the claims in the Territory of Louisiana,
and if confirmed at once, by the outer lines of a survey to be made by
the principal deputy, would give general satisfaction, and save the Uni-
ted States a deal of useless investigation into subjects that are merely
matters of individual dispute ; the United States can claim no right
over the same, except a few solitary village lots and inconsiderable va-
cant spots of little value, which might be given to the inhabitants for the
use of schools."

These letters show that Congress was in possession of full information
on the subject ; and the act of 13th June, 1812, seems to be framed with
great caution. Notwithstanding these vacancies within the out-boun-
dary line suggested by Mr. Riddick, were represented as inconsiderable
vacant spots of little value, they were not granted en masse to the
schools, but were first subject to be appropriated by the President to
military purposes, and after that object was accomplished, they were
reserved for the use of schools ; providing, however, that in no event
should the portion appropriated to this latter purpose, exceed the one-
twentieth of the whole land embraced by the out boundary.

It would be a little remarkable if Congress had exhibited all this cir-
cumspection in reserving for military purposes, and for the promotion of
education, abandoned lots in the village, or vacancies in the common
fields.

The ninth and twelfth instructions, asked by the plaintiff in error,
call in question this legality of the survey given in evidence on the
trial, purporting to be the out-boundary line of the town of St. Louis,
as it stood incorporated on the 13th June, 1812, "including the out-lots,
common field lots of the common field of St. Louis, and the common
thereto belonging," and purporting to be made in pursuance of the first
section of the act of 13th June, 1812.

Several objections are made to this survey, founded partly on the tes-
timony given at the trial, consisting of the opinions of practical sur-
veyors, and facts detailed by them, and partly upon matters appearing

on the face of the survey. One objection is, that the survey does not comprehend the Big Prairie, and Barrierre des Noyes common fields; another is, that the survey comprehends too much, and might have been made pursuant to law, leaving out several strips of ground now taken in. The first objection is certainly not available. If the United States and the corporation, (plaintiff below) are agreed upon this point, I am unable to see upon what principle the defendant should be permited to object that the survey does not embrace all the land which it should have embraced. The survey having been made by an officer duly authorized by law, was therefore *prima facia* evidence of what it purported to be, and the defendant if permitted to contest it on this ground, would be occupying the position of a mere trespasser. The principle sanctioned by this court in Hunter vs. Hemphill, would, I think, preclude a party so situated from taking such an objection.

But the second objection rests on different grounds. If the survey embraced more than the act required, the rights of third persons originating subsequently to 1812, but before the actual making of the survey, might be materially affected. The out-boundary line directed by the act, was to embrace nothing except town or village lots, out-lots, common field lots, and commons, in, adjoining and belonging to the town of St. Louis, at the passage of the act. If it did, the defendant below had a right to show it; whether he is a trespasser or not depends on the legality of the survey. If the survey did not rightfully embrace the land in dispute, it was public land, and liable to sale and location; if it did, the land was not so liable, and the defendant's New Madrid location was a nullity. Whether the survey was inaccurate in this respect or not, is a mixed question of law and fact; so far as the question depends on the construction of the statute itself, it is a question of law; whether the lot in controversy was within the limits directed by the act, is a question of fact for the jury.

The first instruction given by the court of common pleas, at the instance of the plaintiff below, was a correct exposition of the law on this point. By the second instruction given, the jury were left to determine whether the lot in controversy was within the out-boundary of the town of St. Louis, surveyed so as to include the out lots, common field lots, and commons thereto belonging. This instruction either assumes that the survey of the out-boundaries given in evidence, was conclusive upon the defendant, or leaves its legality to be determined by the jury as a question of law. As the court rejected all instructions impeaching the validity of the survey, I presume the second instruction was intended to assert that principle, and therefore virtually directed

the jury to find for the plaintiff, if the lot in controversy was within the surveyed out boundary which was in evidence.

Though I am not prepared with the evidence now before the court to say that this instruction was absolutely and abstractly correct, that is, that there may not be valid objections to this survey, yet so far as the present defendant is concerned, he cannot complain, if any survey made in conformity to the law, must have embraced the lot proved to have been occupied by him.

As before observed, I reject that interpretation of the law, which requires occupancy or cultivation prior to Dec. 1803, as essential proof to establish a town or out-lot of the town. What then was the condition of the strip of ground, numbered on the survey lot 3198, in 1812? It was surrounded on three sides by streets. On the east was a lot belonging to Madam Luchaire, and confirmed to her by the Recorder in 1815, as a village lot. On the west was the land of Beauvois, which in 1799 was described as "situate to the north of the town, on the hill west of Main street, and bounded south by a cross street, that separates it from the last lot of the town, on the north by the land of Clamorgan, &c., which space may contain about the ordinary lot of 120 feet front by the accustomed depth of 300 feet." This would seem to be a town lot, at least in contemplation, as early as 1799. The vacant space between these lots, must surely be held a town lot, within the meaning of the second section of the act of 1812.

The judgment of the court of common pleas should, in my opinion, be affirmed.

SCOTT, J. I concur in affirming the judgment on the main point in the cause.

TOMPKINS, J., dissenting.

This is an action of ejectment, prosecuted in the court of common pleas, by the Board, &c., against John Trotter. Judgment was there given for the plaintiffs, and to reverse it, Trotter prosecutes this writ of error.

It appears from the evidence in the bill of exceptions, that most of the jurors were residents of the city of St. Louis, and Trotter having objected to them on that account, his objection was overruled, and that he excepted to the decision of the court.

The plaintiffs offered in evidence a transcript of the record of the

county court of St. Louis county, containing an order of that court made in November, 1809, incorporating the town of St. Louis, with certain limits therein mentioned. To the admission of this evidence the defendant objected, and his objections being overruled, excepted.

The plaintiffs then offered in evidence a plat and survey entitled a plat and description of the survey of the out-boundary lines of the town, now city of St. Louis, as it stood incorporated on the 13th June in the year 1812, including all the out-lots, common-field lots of the common field of St. Louis, and commons thereto belonging, made in pursuance of the act of Congress of 13th June, 1812, entitled an act making further provision for settling claims to land in the Territory of Missouri.

The defendant objected to the admission of this document in evidence; his objection was overruled, and he excepted, and it was agreed that this plat too might be read in evidence, being too large to be entered upon the bill of exceptions.

The plaintiff then gave in evidence a certified copy of certain instructions of the Commissioner of the General Land Office, of which a copy follows:

"GENERAL LAND OFFICE,
        *January* 15*th*, 1839.

SIR:

I have received your report of the 19th September last, with the accompanying papers, in relation to the claims of the school commissioners to certain lands, under the acts of June, 1812; (Land Laws, p. 620,) and 26 May, 1824, (do. p. 884) in the city of St. Louis, for the support of schools.

The application in behalf of the School Commissioners is, that I will instruct the Surveyor General of Missouri, to designate and set apart for the support of schools in the town of St. Louis, all the vacant *ground* lying between the first line of the common field of the town of St. Louis, and the claims of Chouteau, Eglise, Yosti, Soulard, Clamorgan, and Third street; also any vacant land lying between the survey of Clamorgan and Cherry street south, extending from Cherry street south to the river, if it shall appear by the record of this office, and the records of the Recorder of Land Titles, that said grounds were vacant on the 13th June, 1812, provided the said grounds thus assigned do not exceed one-twentieth of the whole land thus included in the general survey of the town.

This ground is represented in green and yellow on the diagram B, accompanying your letter of 22d December, 1837, to the President and

Directors of the Board of School Commissioners for the city of St. Louis, and also on the diagram D and F, transmitted with your report of the 19th of September last.

It appears that there was a military occupancy by the former government on a part of the ground (represented by a yellow shade on diagram B,) and that the tract claimed by the Commissioners is covered by the New Madrid location, (Cert 184,) in the name of Henry Peroux, under Francis Hamlin.

The position of the land in question on which there was a military occupancy, is not reserved for military purposes, as appears by the communication from the War Department, copies of which were transmitted to you on the 18th day of July last.

On a careful examination of this case, I am of opinion that the act of 13th June, 1812, has reference to the corporate limits of St. Louis, as they existed at the date of that act; the same having been established by a decree of the court of common pleas of the district of St. Louis, in 1809, and which are as presented on your diagram D by the lines *al l m*, *m n*, and thence up the river to *a*.

The tract in question, in the opinion of this office, not being the land the sale of which is authorized by law, Peroux's claim to it must be regarded as invalid, under the second section of the said act of 26th of May, 1824, making it the duty of the Surveyor General, within whose district such lots lie, to proceed under the instructions of the Commissioner of the General Land Office, to survey, designate, and set apart to the towns and villages mentioned in the act, so many of the vacant town or village lots, out-lots, and common field lots for the support of schools in the said towns and villages, as the President of the United States shall not before that time have reserved for military purposes; "not exceeding," however, one-twentieth part of the whole lands included in such town or village. &c. You are instructed to survey, designate and set apart for the support of schools in St. Louis, the portion of land now applied for, and return to this office an approved diagram of the same."

This letter purports to be signed by the Commissioner of the General Land Office, and addressed to the Surveyor General of Illinois and Missouri, at St. Louis.

The plaintiff then gave in evidence a certain diagram headed B, on which the space between Cherry street and Jaques Clamorgan, running from the Mississippi river, to the line of Third street, produced is colored in blue ink, and the space immediately west therefrom is in green and southwardly in yellow; then follows the diagram.

The plaintiff then gave in evidence the plat and survey purporting to be the designation and setting apart of a lot or piece of ground for the support of schools, which is as follows, &c.

A witness then produced by the plaintiff, proved that the land sued for was within the limits designated by the Surveyor General, and that the defendant at the time of the commencement of this suit resided on the land sued for. The plaintiff then closed his evidence.

The defendant then gave in evidence several documents. But as I have not been able after a careful attention both to the oral and written argument, to perceive the relevancy of that evidence, I shall pass it without further notice at this time. But if I find it shall become necessary, I may hereafter detail so much thereof as may seem necessary to illustrate what I may say in this opinion, observing only, that the defendant claims by virtue of a location made under a certificate, dated 30th November, 1815, issued by Frederick Bates, then Recorder of Land Titles, stating that in conformity to the provisions of the act of Congress of the 17th February, 1815, the said Henry Peroux, or his legal representatives, is entitled to locate any quantity of land not exceeding one hundred and sixty acres, on any of the public lands of the Territory of Missouri, the sale of which is authorized by law. This location was made on the 7th day of April, 1817.

The defendant then examined several witnesses, the object of whose testimony appeared to be to prove what were the out-boundary lines of St. Louis, on the 13th day of June, 1812, and also the meaning of the words *lot*, and *out-lot*, as used in this act of 13th June, 1812, under which the plaintiffs claim, and the extent of the town in the year one thousand eight hundred and four, at the time of the change of government. The town of St. Louis had then only three streets parallel with the Mississippi river river, of which the western was called Barn street, from the fact that the barns of the village were generally built along on the west side of that street. And it was also in evidence, that there was a considerable vacant space west of the said Third street, lying betwixt it and the common field fence, which was built along on the east ends of the common field lots.

The testimony being closed, the plaintiffs prayed the following instructions, to-wit:

1. The special survey given in evidence by the plaintiffs, purporting to be a survey made in pursuance to the act of Congress of the 13th June 1812, is prima facie evidence of the out-boundary lines of the town of St. Louis, surveyed so as to include the out-lots, common field lots, and commons thereto belonging.

2. If the jury find from the evidence that the lot or parcel of ground designated by the survey numbered 3198, given in evidence in this case, is within the out-boundary lines of the town of St. Louis, so as to include the out-lots, common field lots, and commons thereto belonging, and before the commencement of this suit the Surveyor of Public Lands for Illinois and Missouri, under the instructions of the Commissioner of the General Land Office, did survey, designate and set apart to the said town, the said lot for the support of schools therein, then the plaintiff has shown a sufficient title to said lot.

To the giving of which the defendant objected, but the court gave them, to which action of the court, the defendant by his counsel excepted.

The defendant then prayed the court to give the jury sixteen instructions, of which I shall notice these following only, believing the others to be irrelevant or mere repetitions of such as I shall take occasion to observe on, for I do not wish to embarrass the case either with useless words or useless matter:

2. If the jury believe from the evidence that the land sued for in this action, was not, nor any part thereof, either a town lot or a village lot, out-lot, or common field lot, on the twentieth day of December, one thousand eight hundred and three, they are bound to find for the defendant.

5. That the act of Congress of 13th June, 1812, entitled an act making further provision for settling claims to land in the Territory of Missouri, does not reserve for the use of schools in the towns and villages therein mentioned, any land which had not been made a town or village lot, out-lot, or common field lot, previously, by the proper authority.

7. That the location under the New Madrid certificate, so called, in favor of Henry Peroux, or his legal representatives, given in evidence in this case, is a better title to the land in question, than that shown by the plaintiffs, if the jury believe from the evidence that the said land is embraced in such location, and that it was not on the 13th of June, 1812, or before, either a town or village lot, out-lot or common field lot of St· Louis.

8. If the jury believe from the evidence that the land in question, before and on the 13th day of June, 1812, was a vacant space, and not embraced within the streets of St. Louis, nor included among the regular lots of the village, and that it had never been a common field lot, then the said act of Congress did not reserve it for the support of schools.

10. That the land in question was not reserved for the use of schools by the said act of Congress of 13th June, 1812, although a vacant space lying within the limits of St. Louis, as incorporated by the court of common pleas, unless it were a town or village lot, out-lot, or common field lot, previously designated as such.

13, 14, 15. That the plaintiffs are not entitled to recover in this action, because the acts of Congress of 13th June, 1812, and of January, 1831, and the act of the Legislature of Missouri, incorporating the plaintiffs, have conferred no title on them.

These instructions were refused, and the defendant excepted. The verdict of the jury being found against the defendant, he moved for a new trial, for all the common place reasons, assigning also some particular reasons; as, that some of the jury were inhabitants of the old town of St. Louis, and others within the limits of the streets surveyed and marked out since the date of the act of 13th June, 1812, and that the act of the Missouri Legislature of 1832, p. 37, incorporating the plaintiffs below, defendant in error here, diverts the trust fund, and is therefore unconstitutional. I pass the point arising out of these three instructions, of which I have given a summary, without noticing them further.

If indeed the plaintiff in error be, as is contended, a mere trespasser, having acquired from the United States, under whom he claims, no color of title, then the selection and designation of lots for the support of schools in St. Louis, by the Surveyor General, under the direction of the Commissioner of the General Land Office, however inconsistently it may have been made with the letter, language, and spirit of the act of Congress of 13th June, 1812, cannot be invalidated by any act of this plaintiff in error. Hunter vs. Hemphill, 6 Mo. Rep. p. 106. In this case Hunter claimed the disputed land, under a certificate of purchase made to him by the Receiver of the Land Office at Palmyra. Hemphill, the defendant in the action, offered to prove that the land had not been advertised for sale. The court decided that the defendant had no right to question the regularity of the sale.

The plaintiff in error, as has been shown, claims the land in controversy, by virtue of a location made under the authority of a certificate issued by the Recorder of land titles, dated November 30th, 1815, stating that in conformity to the act of Congress of 17th January, 1815, Henry Peroux, or his legal representatives, is entitled to locate any quantity of land not exceeding one hundred and sixty acres, on any of the public lands in the Territory of Missouri, the sale of which is authorized by law. By the act of 3d March, 1811, Congress had au-

thorized the President of the United States to direct so much of the public lands in the Territory of Louisiana to be surveyed and sold, as he might think proper; and by the act of 4th June, 1812, this Territory of Louisiana became the Territory of Missouri. The land then had been authorized to be sold, and the location on it was made on the 7th of April, 1817, more than twenty years before the same was designated and set apart for the support of schools by the Surveyor General, under the direction of the Commissioner of the General Land Office. It becomes then the duty of the defendant in error, to show that the land in controversy was either a town or village lot, out-lot, or common field lot, not rightfully owned or claimed by any private individual, for none other is reserved for the support of schools, by the 2d section of the act of 13th June, 1812.

In order to understand well the provisions of this second section, it is necessary to advert as well to the first section as to the title of the act. The act is entitled, "an act making further provisions for settling the claims to land in the Territory of Missouri. By this act Frederick Bates, late Recorder of land titles, had succeeded to all the powers and duties of the board of commissioners established by the act of 2d March, 1805, and through eight long sections, Congress steadily pursues their object, pointing out the duties of the Recorder in every case that could be anticipated.

The material part of the first section is as follows: " Be it enacted, &c., that the rights, titles and claims, to town or village lots, out-lots, or common field lots, in, adjoining, and belonging to the several towns or villages of Portage des Sioux, St. Charles, St. Louis, &c., which have been inhabited, cultivated or possessed prior to the twentieth day of December, one thousand eight hundred and three, shall be and the same are hereby confirmed to the inhabitants of the respective towns, or villages aforesaid, according to their several right or rights in common thereto, Provided, &c." The latter part of the section directs the surveying and marking of the out-boundary lines of the severa towns or villages by the principal deputy surveyor, so as to include the out-lots, common field lots, and commons thereto respectively belonging. The second section provides that all town or village lots, out lots, or common field lots, and commons included in the general survey, (above directed to be made,) which are not rightfully owned, or claimed by any private individuals, or held as commons belonging to such towns or villages, "that the President of the United States may not think proper to reserve for military purposes, shall be and the same are hereby reserved for the support of schools, in the respective towns or

villages aforesaid: *Provided*, that the whole quantity of land contained in the lots reserved for the support of schools in any one town or village, shall not exceed one-twentieth part of the whole lands included in the general survey of such town or village."

Nothing is given here but town or village lots, out-lots or common field lots; and to prevent too loose a construction of the granting part of the act, it is expressly provided, that the *land* contained in the *lots* reserved for the support of schools, in any one town or village, shall not exceed one-twentieth part of the whole *lands* included in the general survey of such town or village. Here the word *land* is twice used in contradistinction to the word *lot*, in the short space of three lines, as if to declare in so many words the belief of Congress that there might be included in this general survey of these towns or villages, as well as *land* not divided into *lots*, as *lots* already divided or marked out at the passage of the act, to wit: prior to the 20th day of December, 1803, since which time Congress did not recognize any authority in Missouri Territory to lay off lots in these towns or villages. If, then, the *land* contained in the lots *not rightfully* owned or claimed by any private individuals, should exceed one-twentieth part of the whole lands included in the general survey of such town or village, then only could so many lots be reserved, as amounted to one-twentieth part of the whole lands. On the contrary, if the land contained in all the lots not rightfully claimed, amounted to less than one-twentieth part of the whole lands included in the general survey, it is absurd to say that any other power than Congress can give the deficiency, and it is still more absurd to say that Congress intended to give what their language does not import. Their officer may give, and if he give nothing but their property, his act is valid, till they choose to annul it; but if he give what has been appropriated by another, his act is void. If, then, there be not lots, such as are directed to be reserved for the support of schools, in the second section, not rightfully owned or claimed by any private individuals, then Congress neither gave, nor intended to give any thing for the support of schools, in the town or village where none such were found. Had Congress intended to give one-twentieth part of the land contained in the general survey, the proper terms to express their meaning were at hand, and it could have been expressed in much fewer words. But this general survey was directed to be so made, as to include the out-lots, common field lots, and commons thereto belonging. If, then, these out-lots had no existence other than as land, no person could know when the survey did include them. It has been twice solemnly decided by this court, that an inhabitant of one of these

villages, to get a lot under the 1st section, must prove the existence of his lot prior to the 20th day of December, 1803: Lawless vs. Newman, 5 Mo. Rep. 241. The point arose on an instruction given by the circuit court, all the judges being present and assenting. With this decision the cause was remanded, and a verdict found for Lawless, and the judgment of the circuit court affirmed. Judge Napton concurred in affirming the judgment of the circuit court, on the ground that there was no evidence on the record of so decisive a character, that Marli's enclosure was a village lot, as would require this court to set aside the verdict of the jury. Judge McGirk being indisposed did not sit. If the lots confirmed to the inhabitants, in consideration of habitation, cultivation or possession, must have had a legal existence prior to the 20th day of December, 1803, equally ought those lots not rightfully owned or claimed by any private individuals, to have had a legal existence before the 20th December, 1803. Indeed it is an absurdity in terms to call *land* a *lot* before it is divided. "The word *lot* in the United States," says Webster, "signifies a piece or division of land, perhaps originally assigned by drawing lots, but now any portion, piece or division of land." In this sense Congress used the words town or village lots, out-lots, &c. If not, then the direction given to the principal deputy to survey the out-boundary lines so as to include the out-lots, common field lots, and commons, means nothing. For if every thing included in the general survey, except the common field lots and commons, be intended by the word *out-lots*, then the principal deputy was at liberty to include the whole territory of Missouri, and then by the same liberal construction of the meaning of the word *out-lot*, one-twentieth part of the whole land would be intended to be reserved for the use of schools. But it is contended by the defendants in error, that if Congress intended by this second section, to give nothing but the land contained in the lots laid out under the authority of France or Spain, then they, the said defendants in error, will have nothing left for the support of schools; for, say they, there are no such lots left vacant in St. Louis; Congress, therefore, must have intended, say they, contrary to their express declaration, to give for the support of schools, not lots having a lawful existence under the preceding government, but one-twentieth part of the whole lands included in the general survey. For they further say, Congress had in the 14th sec. of the act of the 4th of June, 1812, providing for the government of the territory of Missouri, declared that schools, and the means of education, shall be encouraged and provided for from the public lands of the United States; and although Congress had made a most munificent provision from the public lands for the encouragement of education in the Territory general-

ly, yet all the lands, near these enumerated villages, being appropriated to satisfy private claims, they would not be able to obtain their usual provision of the 16th section, and that this provision made in the second section for the support of schools in the several enumerated villages must be supposed to be a compensation for the loss of the sixteenth section.

Congress pledges its faith to the Territory of Missouri, to encourage and provide the means of education, and not to these villages enumerated in the first section of the act of 13th June, 1812. There is nothing, either in the title, or in the body of that act, to induce one to suppose that Congress in passing it, considered itself as redeeming a pledge made or given in the above mentioned 14th sec. of the act of 4th of June, 1812, the object of which is to provide for the government of the Territory of Missouri, whilst the object of the act of 13th of June, 1812, is to make further provision for settling claims to land in the Territory of Missouri. As above observed, it continues true to its object throughout the provisions of eight long sections; and so far was Congress from being affected with the knowledge that all the lands in the vicinity of these villages had been applied to satisfy private claims, that it appears from this act, that the public lands had not been then surveyed. For by the 5th section the principal deputy is directed to survey those to which the Indian had been extinguished. It moreover appears by this record, that there was in 1812, much vacant land near St. Louis.

The history of this act of 13th June, 1812, is so well known in St. Louis, that it is difficult to conceive how the defendants in error can be ignorant of it. As the material is on this record for other purposes, (which I am not able to appreciate,) I will give it: On the 30th day of June, 1808, four citizens of St. Louis, Pierre Chouteau, Bernard Pratte, —— Hebert, and E. Yosti, filed with the Recorder of Land Titles, on behalf of the citizens of St. Louis, a claim for all lots, designated on a plat presented along with their claim. I suppose this claim filed, and the proceedings on it by the board of Commissioners, was intended as some evidence of the out boundary lines of St. Louis, which, as I conceive, are quite immaterial, so far as the plaintiff in error is concerned.

The thirtieth day of June, 1808, was the last day allowed for filing claims, to be adjudicated on by that board. The copy of the proceedings shows that Penrose voted for the confirmation of the whole: Bates and Lucas voted against it: Judge Lucas giving at large some very sensible reasons for his vote. Penrose, the said commissioner, and Riddick, the clerk to the Board, bore the report of that Board to Washington City in 1812, and remained in Washington City till the last of

March, at least. While they were there, Mr. Penrose addressed a very long letter on the subject of these claims yet unsettled, to Mr. Gallatin, then Secretary of the Treasury, and Mr. Riddick another to Mr· Morrow, Chairman of the Committee of Public Lands. Both these letters are agreed to be considered as on the record. I copied into my opinion in the case of Hammond vs. the same defendants in error, so much of them as is material here. See page 85 of the 8th vol. Mo. Rep. A plain man who would read these extracts on the 85th page above cited, could not fail to see in them the origin of the two first sections of this act of 13th June, 1812. But when we connect with these extracts, the claims filed on the 30th July, 1808, as above mentioned, and when we consider the proceedings of the Board on these claims, the conclusion is almost irresistible, that Chouteau, Pratte, and others filed their claims at the suggestion of Penrose and Riddick. Both these letters of Penrose and Riddick were communicated to the House of Representatives. Penrose's was dated 20th March, 1812, and Riddick's the 26th March of the same year.

So negligent were those inhabitants in proving up their claims, that the act of 26th May, 1824, was afterwards passed to allow them further time for filing their claims.

A lot, in the sense in which the word has been here used by Congress, is a piece, or division of land, marked out by authority of law, prior to the 20th day of December, 1803, for since that time, and prior to the passage of the act of 13th June, 1812, the Congress of the United States recognized no power west of the Mississippi, authorized to lay out lots in the Territory.

The defendants in error then, having no right according to the express language of the second section above cited, to receive for the support of schools, any land but what is contained in a town or village lot, an out-lot, or common field lot, it is quite immaterial to the plaintiff in error, what were the out-boundary lines intended by this act to be assigned to St. Louis. It is also immaterial to the merits of this case, whether according to Stoddard and Breckinridge, the French inhabitants at and near the Fort de Chartres, first came to St. Louis in the spring of the year 1766, then well knowing the French territory west of the Mississippi to have been transferred to Spain, and found it already inhabited, the survey of the town having been quite accurately made in the year 1764, by Pierre La Clede, Maxan and Company, (in pursuance of an order of the crown of France made before the cession, as will very readily be believed by every body a little acquainted with the history of the French settlements in North America,) or whe-

ther those French inhabitants, according to the defendants in error, after the arrival of Count O'Reilly in 1769, at New Orleans, removed to the place where St. Louis now is, still believing the country to belong to France, because they did not desire to be transferred to the British Crown, and by conventional arrangements among themselves, made their settlements in the form of a village, leaving vacant spaces at convenient distances for streets. A lot, in the sense in which Congress uses the word, is still a piece or division of land, that had at the time of the passage of the act, a legal existence; and if at the time of the passage of the act it legally existed, it must also have legally existed prior to the 20th day of December, 1803. The defendants in error, on the 29th page of their printed argument, say, truly, that the word *lot* has no technical signification. But in the sense in which it is here used, it must have received a form from the hand of some person authorized to give it that construction.

Thus much being said, I will proceed to examine the instructions given and refused, premising that Congress by the act of 26th May, 1824, and 27th January, 1831, gave nothing more than had been given by the act of 1812, nor could they give it, to the detriment of the plaintiff in error.

To the first instruction asked by the defendant in error, there is no objection to be made; but to me it appears that a question about the out-boundary lines, could scarcely arise, unless the United States were a party, and no exception appears to be taken.

The second instruction assumes the whole ground, that every piece of land included within the out-boundary lines, is such a lot as is designed to be reserved for the support of schools.

In the beginning it is modestly called a lot, or parcel of ground, then it is called absolutely a lot, and the court is prayed to tell the jury, that if they find that the surveyor did survey, designate and set apart to the said town, the said lot for the support of schools, the plaintiffs have shown a sufficient title. It has been sufficiently shown that no lots could have been given by Congress, except such as had a legal existence prior to the 20th day of December, 1803, unless we commit such an outrage on the plain and obvious meaning of the language of Congress in the second or granting section, as to call all the land included in the out-boundary lines of the general survey, either a town or village lot, out-lot, or common field lot, while the same section contemplates the existence of land undivided, and of lots within that survey, as when it is provided that the whole quantity of *land* contained in the lots, reserved for the support of schools, shall not exceed one-

twentieth part of the whole land included in the general survey, where the word *land* is twice used in contradistinction to the word *lot*, manifestly showing that Congress did not consider all the land included in the general survey as lots. Should it be found upon proper investigation that the corporation of St. Louis, since the occupation of the country by the United States, (whether before or after the passage of this act, is immaterial,) themselves surveyed and marked out these streets, bounding this lot, then it can by no means be called such a lot, as Congress intended to reserve for the support of schools.

The defendants in error, by way of illustrating their case, stated in their oral argument, that they occupied and held in peace a lot which lay in the south-eastern intersection of Market street, produced in the year 1816, and Fourth street, which was laid out in the same year by private individuals. It is in evidence in this case, and has been in several kindred cases, that there was at the change of government, much vacant land betwixt Third street and the space of ground now occupied by Fourth street. Some of this ground lying in the intersection of Market and Fourth streets, both as aforesaid made by private persons, they claim as a lot, and thus their own trespass is cited as an authority to regulate the decisions of this court. Many trespassers have taken timber off the land of the United States, in Missouri, but none, I hope, have yet claimed the right to take the timber of private individuals, because they had not been punished for taking that of the United States.

The second instruction appears to me to be greatly erroneous.

The second and fifth instructions prayed by the defendant below, plaintiff in error, ought to have been given for the same reasons that the second asked by the plaintiff below, defendant in error, ought to have been refused. Congress gave nothing but lots for the support of schools, and after the 20th day of December, 1803, there existed no authority to lay out lots in St. Louis, consequently every lot given by the act must have had a legal existence before the transfer of the Territory to the United States. Had Congress intended to give for the support of schools in St. Louis, any land not divided into lots, that instruction might and would have been expressed in terms plain and simple. They had only to say that they gave for the support of schools, one-twentieth part of the land contained in the general survey of the town or village. But they chose rather to say, they gave lots not rightfully owned or claimed by any private individuals, with a proviso that the land contained in these lots should not exceed one-twentieth part

7

of the whole lands contained in the general survey. These two instructions should clearly have been given.

The seventh instruction ought to have been given. The eighth instruction might, I believe, with safety have been given, but as the merits of the case might well have been examined on the other instructions, the eighth might well have been omitted. This act of 13th June, 1812, was most manifestly framed, or at least the two first sections of it were framed on the letters of Penrose and Riddick, referred to in Hammond vs. the defendant's in error; and although Congress, as is contended, had other sources of information, yet it is hard to conceive that they had any as good and convenient—Judge Lucas and Mr. Bates, the two other commissioners, being presumed to be at home. Penrose calls them out-lots, or field lots, (as they are termed,) and says all those tracts have been cultivated from 15 to 50 years, p. 85 of 8th vol. The late Judge Laduc understood them to be synonymous terms. He had resided in St. Louis from 1799, and had been till the transfer of the country, Private Secretary to the last Lieutenant Governor, and till his death a few years since, was officially connected with the records of land titles. See his testimony in the bill of exceptions, in the case of Newman vs. Lawless, on file in the office of the clerk of the supreme court. Mr. Paul, the city surveyor, who in 1816, ran out this Fourth street above mentioned, and laid out the addition to St. Louis, in 1816, entertained the same opinion; his testimony is found on the same record with that of Judge Laduc above mentioned. It is true there were other out-lots, as mill lots and barn lots, but as every inhabitant would not want a mill or barn, these it may be presumed, were conceded only on special request, and were not marked out to lie vacant till some demandant appeared; and it has never yet appeared that any of these lots have been cultivated from fifteen to fifty years. Penrose says, the out-lots, or field lots, (as they are termed,) had been. The eighth instruction might with propriety have been refused, for if it can be shown that there were other out-lots than common field lots vacant, that is, not rightfully owned or claimed by private individuals, then they have a right to take them for the support of schools, till they acquire a portion of land not exceeding one-twentieth part of the whole lands included in the general survey of the town.

The tenth instruction is unexceptionable and should have been given.

The eleventh instruction is a mere echo of the tenth. The other five instructions asked by the plaintiff in error, do not, in my opinion, merit attention.

I feel myself justified in saying that this was the cotemporaneous construction given to that act. In 1812, the best informed men might well believe that some lots would be found within the general survey of St. Louis, not rightfully owned, or claimed by any private individuals. For most of those claims were not asserted till after the passage of the act of 1812, and many not till after that of 26th May, 1824. Mr. Penrose, in his letter above referred to, after recommending the confirmation of the out-lots, or field lots, as he says they are termed, says "there may be a few vacancies," perhaps in those fields, and advises that they be given to the inhabitants for public schools. Mr. Riddick says:— "The United States can claim no right over the same, except a few solitary village lots, and inconsiderable vacant spots, which might be given to the inhabitants for public schools."

Congress thought proper to give for the support of schools, the "vacant lots," that is, the lots not rightfully owned or claimed by any private individuals; but they give neither the "few vacancies" of Penrose, nor "the inconsiderable vacant spots" of Riddick. These men lived long afterwards at St. Louis, rich and influential, deeply interested in its prosperity, and never did they use their influence to appropriate these "few vacancies," or "inconsiderable vacant spots," for the support of schools. The evidences of their zeal in behalf of the public schools, we have seen in the extracts from their letters.

Again, on the 30th January, 1817, an act of the Missouri Legislature, by which seven of the most respectable citizens of the town or village of St. Louis, were appointed to take in charge "all the lands and other property which hath, or may be given by Congress, to said town for the support of schools, and appropriate the same," &c. I speak now from my own knowledge of what I saw, and of what I acted a part, for I suppose the Journals are all burnt in the State House, and feel assured that no man will deny a word that I say, although most of the actors are removed from this life. At the commencement of the session of 1818, the last session of the Territorial Government, an eminent young lawyer, representing St. Louis county, and residing in the village, introduced a bill to repeal the law. Never has St. Louis been more ably represented, and fortunate will she be, if in a century to come she shall be more ably represented. The late Judge Laduc was a member, than whom, not even one of the first Board of Commissioners to settle and adjust claims to land, knew more of these claims.

Not one of this able representation, though four of them lived in the village, stirred to prevent the repeal of this act.

Unfortunately for the success of the introducer of the bill, he had

undertaken too much. His bill was framed with a view to repeal this act, and another act passed also, at the same session of 1817, that is, "An act to encourage the killing of wolves, panthers and wild cats." This the frontier members considered as officious intermeddling in their own peculiar business. The members from the Boonslick country, then first represented in the legislative body, rose as one man, and calling on all those in like situation, caused the bill to be rejected at the first reading. It is necessary to say that this young lawyer yet lives, and by a long train of services in the legislative body, has shown himself to be amongst the ablest, if not absolutely the ablest, man in the State. At that last session, Mr. Riddick was a distinguished member of the Council, and he, like the representation in the House, made no more efforts in behalf of the supposed interests of the public schools, knowing well, I suppose, that they had no shadow of claim, under the act of 13th June, 1812. About that time, perhaps while the last Territorial Assembly was sitting, the jailor of St. Louis county claimed the right of pre-emption in the purchase of all the vacant land lying betwixt Third and Fourth streets, and I know that it was the opinion of the late Judge McGirk, that he was entitled to it. At that time I was well acquainted in St. Louis, and had been so for nine years previous, and though on the occasion of the passage of this act of 1817, I had heard much against the claim of the public schools, I cannot charge my memory with one word said in their favor; and the act of 30th January, 1817, had become so much a dead letter, that when in the argument of the case of Hammond vs. the same defendants in error, Mr. Spalding intimated that the defendants had forfeited their right by a non user. Mr. Bates, who lived in St. Louis at the passage of that law, answered that they could not use it, because the Legislature had conferred on them no power. It was reserved, in my opinion, for the ingenuity of these latter days, to find out that the word *out-lot* means any piece of vacant land that lay within the general survey. The defendants in error have attributed to the late Mr. Hempstead the introduction of the convenient word *out lot* in the act of 13th June, 1812, to whom both in the oral argument of this case, and in that of Hammond vs. the same defendants, they gave a seat in Congress for the purpose of framing the bill, and so laudably zealous were they in the cause of education, that they did not at first perceive that the law was passed the session before Missouri had a delegate in Congress. But the blunder perceived was easily corrected, by sending Mr. H. to Congress on private business. If Mr. Hempstead had been on that occasion at Washington City, it is not probable that the chairman of the committee on Public Lands would have

required him to write the bill in preference to Penrose, the late commissioner, or Riddick, the clerk to the board; since either of these last understood the subject much better than Mr. Hempstead's professional labors allowed him to do it, and certainly both Penrose and Riddick were as capable of writing as was Mr. H. Mr. Hempstead left behind him a high character for openness and plain dealing. Had he written the second section of this act, under which the defendants in error claim this land, with a view to give them land whether divided into lots or not, he would have stated in plain terms, that one-twentieth part of the land contained in the general survey shall be reserved for the support of schools. But Mr. Hempstead was most probably at home attending to his extensive professional business, and the law must be construed as if it were framed by some plain man, who was accustomed to use words in their popular sense.

But it is said by the defendants in error, "the President of the United States can select no land for military purposes, within the survey under the act, except such as in the absence of such selection would be set· apart for the use of schools; that the President did reserve a vacant space of ground on the south, and on that lot the United States Magazine is erected." It was not, nobody pretends it ever was a village lot, or common field lot, or that it was ever surveyed, or marked, granted to, or inhabited, cultivated or possessed by any person ; yet it was reserved by the President under the second section." I cannot say that the President reserved that lot under the second section, as I know nothing either of him, or of the reason of his acts, except through the laws of the United States. But most assuredly the Executive of the United States has reserved land for military purposes wherever he pleased, without the aid of the second section of the act of the 13th June, 1812. In the case of Wilcox vs. Jackson, 13 Peters, p. 498, it was decided that the President may reserve for military purposes any lands of the United States; and as he speaks through the heads of Departments, a reservation of land made at the request of the Secretary of War for the purposes of his department, must be considered as made by the President of the United States. Nor did I ever consider the second section as containing a grant of power to reserve lots for military purposes, but as the recognition of a power already existing, which the Congress by the second section declared its intention not to withdraw in favor of the several towns or villages. However that may be, Congress by the act of 27th January, 1831, relinquished to these several towns or villages, all the right, title, and interest of the United States in and to the town or village lots, &c. ; evidently showing that

they did not conceive that the President of the United States either had taken, or would take anything liable to be selected for the support of schools. But suppose for a moment, that the President of the United States had declared in express terms, that he took possession of this piece of ground for military purposes under the second section of this act; is the action of a mere executive, or ministerial officer, however high, to furnish a rule of decision to this or any other court of record? It is to me a novel doctrine. But here it is sought to make the President of the United States an authority not only to this court for the law of the case, but to the jury for the finding of the facts, that such a piece of land as he is said to have selected for military purposes, is an out-lot of St. Louis, for the support of schools under the second section. If our courts gain ground as fast as the defendants in error we shall soon, in imitation of the courts of the Roman civil law, write to the President of the United States for his exposition of the law, as any new case arises.

The second section gives for the support of schools, all town or village lots, out-lots, or common field lots, not rightfully owned or claimed by any private individual, and which the President of the United States may not think proper to retain for military purposes, provided that the whole quantity of land contained in the lots reserved for the support of schools, shall not exceed one-twentieth part of the whole lands included in the general survey of such town or village. The Commissioner of the General Land Office taking on himself the responsibility of changing the language of Congress, directs the Surveyor General to survey, designate, and set apart for the support of schools in St. Louis, not the vacant town or village lots, out-lots, and common-field lots, as the law directs, but "the portion of land now applied for" by the defendants in error, that is to say, all the vacant ground lying between the front line of the common fields of the town of St. Louis and the claims of Chouteau, Eglize, Yosti, Soulard and Clamorgan, and Third street, also any vacant land lying between the survey of Clamorgan and Cherry street south, &c. That is to say, Congress gives lots, and their agent drawing all his authority from their act, gives land. All this, as before observed, would furnish the complainant no ground of complaint, but would be a subject matter of correction to the General Government only, if the plaintiff in error had acquired no right to the disputed land. But if the language of the act of Congress is to prevail over his version of it, then in my opinion, he has transcended his powers. Of this, however, it is the right and duty of the Supreme Court of the United States to decide ultimately. Nothing

is more clear, however, than that Congress uses the word *land* and *lot* in different senses ; and had they intended to give one-twentieth part of the land contained in the general survey, they had no occasion to say anything about giving town or village lots, out-lots, or common field lots. "The word lot," says Webster and the Encyclopædia Americana, "is an *Americanism*. It may be large or small, according to the subject matter of discourse." An American historian might well say that the peace of 1763, when the French North American possessions were divided betwixt England and Spain, that that portion west of the Mississippi, became the *lot* of Spain. But without a strange perversion of language, the Commissioner of the General Land Office could not say that that portion of the land contained in the general survey, which was neither town, nor village lot, or common field lot, and which, of course had not been divided, was either an out-lot or out-lots; if so, then the Commissioner had nothing to do but direct the out-boundary lines of the town to be extended to the limits of the State, and then all the State would become an out-lot or out-lots of St. Louis, and at his pleasure he might designate, &c., for the support of schools in St. Louis, one hundred sections of the best cultivated land in the western counties, with as much propriety as he could the vacant land betwixt Third and Fourth streets, above mentioned. It is true this land was not on the 13th June, 1812, divided into sections, and the vacant land above mentioned, between Third and Fourth streets was also not divided into lots at that time. As a matter of general history, the one fact is as well known as the other, and the court of original jurisdiction has, at the instance of the defendant in error, precluded the plaintiff in error from leaving it to the jury, to find whether the land in controversy, was at the passage of the act, or what is equivalent before the change of government, such a piece of land as could, according to the popular meaning of the words, be granted for the support of schools, by the terms towns or village lot, out-lot, common field lot, in, adjoining, or belonging to St. Louis, assuming the ground that Congress used all this circumspection of town or village lot, out-lot, or common field lot, to mean nothing more than vacant ground, having a definite boundary ; and as all the vacant land lying in the territory has a definite boundary, then, the term out-lot must include all that vacant land.

According to the same construction, the term out-lot must equally mean so much of the vacant land as it may please the Commissioner of the General Land Office to direct to be included in the general survey. But the popular meaning of the word *out-lot*, and common

sense construction, tell us that the out-lot, and the other lots mentioned in the act, require those lots to have a location defined by metes and bounds, so that they can be distinguished, and included within the lines of a general survey, and no more land be included in that general survey than what is found to be contained in the lots and vacancies, if any, that may be found betwixt them. These vacancies, if any, we have seen from the proviso to the second section, are distinguished from the lots, where it is said the whole quantity of land contained in the lots reserved for the support of schools in any one town or village, shall not exceed one-twentieth part of the whole lands included in the general survey of such town or village.

In this last sentence as before observed, Congress has twice used the word *land* in contradistinction to the word *lot*, to show us that every piece of land having a definite boundary, does necessarily become such a town or village lot, out-lot, or common field lot, as to authorize the Surveyor to reserve it for the support of schools in St. Louis.

The second instruction asked by the defendant in error, was wrongfully given, and of those asked by the plaintiff in error, the second, fifth, seventh and tenth, were in my opinion wrongfully refused; and for this reason it is my opinion the judgment of the court of common pleas ought to be reversed.

—————

**P. S.** Since the above opinion was written, the following account of the origin of St. Louis has been found:

" The city of St. Louis, was founded in the year 1764, by Monsieur Laclede, one of the partners in a mercantile association, known under the name of Laclede, Ligueste, Maxan, and Company, to whom the Director General of the Province of Louisiana, had granted the exclusive privilege of trading with the Indians of the Missouri, and those west of the Mississippi above the Missouri, as far up as the river St. Peter. The traffic in furs and peltries with these distant tribes, though of great value, would have been unavailable without a suitable place of deposite of merchandize ; and to induce the company to hazard the establishment of such a depot, which would serve as the nucleus of new settlements west of the Mississippi, extensive powers were given to the gentlemen engaged in this enterprise." Laclede it seems in August 1762, left New Orleans to view the river as far as the mouth of the

Missouri; and concluding that Ste. Genevieve, where there was already a small settlement, was too far below the mouth of the Missouri, he commenced, on the 15th of February, 1764, the work of cutting down trees, and laying out a town, which he called St. Louis, "*after the* reigning King of France." Hall's Sketches of the West, vol. 1, part 2, ch. 2, p. 165. All escape then from construing the word "out-lot" in its ordinary acceptations is hopeless. For here is a grant to this company by the Director or Governor General, in whom alone the power to grant land resided, both under the French and Spanish rule, till 1798, when it was transferred to the Intendant General of the Province, where it remained as long as Louisiana belonged to Spain. 2 vol. Land Laws M. S. p. 530, from No. 2, to No. 14, ending on p. 552 of said volume.